Harold Gross and Ruth Gross v. Commissioner.
Gross v. Commissioner
Docket No. 3311-63.
United States Tax Court
T.C. Memo 1966-125; 1966 Tax Ct. Memo LEXIS 158; 25 T.C.M. (CCH) 639; T.C.M. (RIA) 66125; June 9, 1966
*158 Held: 1. Respondent's determination that petitioner, Harold Gross, received substantial additional sums as payments for services rendered in each of the tax years in question, sustained. 2. The statute of limitations is not a bar to the assessment and collection of taxes for the years 1953 through 1958, because petitioners filed false and fraudulent returns with intent to evade tax for each of those years. A 50 percent fraud penalty imposed. 3. Respondent's disallowance of all itemized deductions claimed by petitioners for each of the years in question for lack of proper substantiation, sustained. 4. Additions to tax for failure to declare and pay annual estimated tax, sustained. Robert A. Freeman, 271 North Ave., New Rochelle, N. Y., for the petitioners. Arnold Y. Kapiloff, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined the following income tax deficiencies and penalties with regard to the joint returns filed by petitioners, Harold and Ruth Gross: Penalty for
Failure to
File Esti-
mated
Fraud
Tax Re-
Year
Deficiency
Penalty [1]
turn [2]
1953
$1,090.66
$ 545.33
$108.07
1954
1,915.07
957.54
195.29
1955
2,210.58
1,105.29
1956
1,659.51
829.76
1957
2,105.50
1,052.75
1958
3,355.98
1,677.99
26.43
*161 The issues for decision are: 1. Whether petitioner, Harold Gross, received additional income from Neo Gravure Printing Company for the taxable years 1953 to 1958, inclusive, in the respective amounts of $4,000, $6,500, $6,500, $4,000, $4,000, and $4,000, which amounts were not included in his income tax returns. 2. Whether petitioners are entitled to itemized deductions claimed in their income tax returns for the years 1953 to 1958, inclusive. 3. Whether petitioners filed false and fraudulent returns for any of the years in question and whether all or any part of the deficiencies in income tax determined for each of said years are due to fraud with intent to evade tax. 4. Whether petitioners are liable for the addition to tax provided for by section 294(d)(1)(A) of the 1939 Code for failure to file a declaration of estimated income tax with respect to the taxable years 1953 and 1954, and for the addition to tax provided by section 6654(a) of the 1954 Code with respect to the taxable year 1958. 5. Whether any statute of limitations bars assessment of any of the deficiencies in issue before us. Findings of Fact Some of the facts have been stipulated. They are adopted *162 as our findings and incorporated herein by this reference. The petitioners are husband and wife. During the years 1953 through 1957 they resided in Forest Hills, New York, and filed their joint Federal income tax returns for those years with the district director of internal revenue, Brooklyn, New York. For the calendar year 1958 they filed their joint return with the district director at Jacksonville, Florida, which return indicated Miami Beach, Florida, as their home address. Since Ruth Gross is a petitioner herein solely by reason of having filed a joint return with her husband, Harold Gross, references hereinafter to petitioner in the singular will be to petitioner, Harold Gross. During the years 1952 through 1958, the petitioner, Harold Gross, was employed as foreman of the shipping department of Neo Gravure Printing Company, 300 Boulevard East, Weehawken, New Jersey, a New Jersey corporation, or its predecessor, Neo Gravure Printing Company, Inc., 601 West 26th Street, New York, New York, a New York corporation (both of which are hereinafter referred to as "Neo Gravure"). During these years, Neo Gravure was a subsidiary of Cuneo Press, Inc., an Illinois corporation. Neo Gravure *163 was engaged in the printing business, employing the rotogravure printing process, and was primarily engaged in the printing of Sunday magazine sections for various newspapers. As foreman of the shipping department, petitioner was the overseer of activities of that department. These activities started with the removal of the printed product from the area adjacent to the presses and continued through the strapping or banding of the product on skids and subsequent loading upon trailer trucks which take the printed product to its ultimate destination. For the years here in question, petitioner was paid a salary for his job as foreman at Neo Gravure. Such salary was reported in the annual W-2 Forms prepared by the employer, copies of which were given to petitioner, and they were also reported in petitioners' joint returns for these years. These reported salaries were as follows: 1953
$ 8,800.20
1954
8,923.20
1955
10,231.20
1956
10,205.00
1957
12,420.20
1958
12,182.40
On or about October 10, 1951, Cuneo Press, Inc., entered into a contract with the Hearst Publishing Company, 63 Vesey Street, New York 7, New York, for the printing of the American Weekly, a *164 magazine or supplement which was to accompany the Sunday editions of the New York Journal American, a Hearst publication, and other newspapers. The aforementioned contract contemplated that copies of the American Weekly would be printed by Neo Gravure and other subsidiaries of Cuneo Press, and that Neo Gravure would print copies of the American Weekly for the New York Journal American and certain other newspapers in the eastern part of the United States. The contract required that Neo Gravure post a $1,000,000 bond with Hearst Publishing Company to assure delivery of the first issue of the American Weekly. During the years 1953 to 1958, inclusive, Charles E. Chenicek was vice president and general manager of Neo Gravure and in charge of all phases of that company's operations at the Weehawken, New Jersey, plant at which petitioner was employed. Also, throughout these years, William P. Hillbrant was treasurer of Neo Gravure and in full charge of all accounting and financial matters. The contract between Cuneo Press and Hearst Publishing Company called for the production of the first issue of the American Weekly under date of May 11, 1952. Neo Gravure proceeded with the mechanical *165 and other arrangements preparatory to the printing of the first issue. At the time Neo Gravure went to press with the first issue of the American Weekly, Chenicek was advised of rumors heard in the plant to the effect that there would be difficulties in effecting the delivery of this first issue. One of the functions of the shipping department of which petitioner was foreman was the loading of American Weekly Magazines upon trucks for delivery to various Hearst newspapers. Employees in the shipping department were members of the International Longshoremen's Association during the years here in question. When Chenicek learned of the rumors referred to above, he called petitioner into his office and inquired whether petitioner had heard about potential difficulties in effecting delivery of the American Weekly. Petitioner at that time stated that he knew nothing about such rumors but that he would check into the situation and report back to Chenicek. A few days later petitioner returned to Chenicek's office and stated to Chenicek that in return for a cash payment of $4,000 per year over the 10-year period of the American Weekly contract, Neo Gravure would have no difficulties in connection *166 with the delivery of the American Weekly. Petitioner requested that the annual payment of $4,000 be made to him in cash. Chenicek subsequently informed the American Weekly of the situation, and, after considering the matter, the American Weekly agreed to authorize the payment of $4,000 each year to avoid any potential problems. Chenicek then advised petitioner that the payments had been authorized and instructed Hillbrant, the treasurer, to arrange to make a payment in the amount of $4,000 cash to petitioner. On or about May 7, 1952, petitioner was paid $4,000 in cash by Hillbrant in the latter's office. During each of the subsequent years 1953, 1954, 1955, 1956, 1957, and 1958, around April or May of each year, [1] petitioner called upon Chenicek to remind him of the annual $4,000 cash payment. Each year after receiving demand from petitioner, Chenicek would secure the approval of the American Weekly and would instruct Hillbrant to make the necessary payment to petitioner in cash. Petitioner received $4,000 in cash in this manner during each of the years in question. *167 In connection with the payments of $4,000 to petitioner during each of the years 1952 to 1958, inclusive, Cuneo Press, the parent corporation of Neo Gravure, billed the American Weekly for these payments and was reimbursed by American Weekly. Cuneo Press then reimbursed Neo Gravure. During the years these payments were being made to petitioner, there were no labor problems in connection with the workers over which petitioner had jurisdiction as foreman other than a delay of one or two days in deliveries prior to the belated $4,000 payment made in October 1954. In October 1954, when Neo Gravure's existing labor contract with the union which represented the company's shipping department employees was about to expire, the petitioner informed Chenicek about the rather substantial benefits that the New York Teamsters had realized in their contract negotiations. Neo Gravure wished to secure a renewal of its expiring contract under a less costly arrangement than that which had been consummated by the New York Teamsters. Chenicek asked petitioner to participate in the contract negotiations with the union with the thought that petitioner might be helpful or instrumental in effectuating *168 a less costly arrangement. Petitioner did sit in on the contract negotiations and participated actively in them. The contract ultimately negotiated with the union was not as costly as it would have been had Neo Gravure followed the terms of the settlement effected by the New York Teamsters. As a result, petitioner was subsequently paid $2,500 in cash in 1954 and $2,500 in cash in 1955. The reason that payments were made in both of these years was that the contract which petitioner had assisted in consummating was a 2-year contract covering both 1954 and 1955. For each of the years here in question, Neo Gravure reported petitioner's regular salary as foreman on W-2 Forms, copies of which were given to petitioner. None of the $4,000 and $2,500 payments described above was included in the W-2 Forms and no Form 1099 or any other type of Federal income tax form was ever issued to petitioner by Neo Gravure with regard to the $4,000 and $2,500 payments (hereinafter sometimes referred to as labor-influence payments). Petitioners' annual joint returns were prepared by a public accountant. Petitioner would turn over to this accountant each year his W-2 Form and other evidences in support *169 of itemized deductions. The public accountant performed no audit but rather prepared petitioners' returns solely from information furnished him by petitioner, Harold Gross. The items of income reflected on petitioners' returns are the items of income of which the petitioners advised the accountant. Also, the itemized deductions claimed were those furnished to him by petitioners. Each year these deductions were very generally described, not specifically itemized, and in many instances in round figures. On October 15, 1959, the petitioner, Harold Gross, was indicted by a Grand Jury for income tax evasion under section 145(b) of the 1939 Code for the year 1953, and under section 7201 of the 1954 Code for the years 1954 through 1958. The indictment charged the filing of false and fraudulent income tax returns for each year and the fraudulent understatement of income in the amounts of $4,000, $6,500, $6,500, $4,000, $4,000, and $4,000, respectively, for the years 1953 through 1958. On August 16, 1960, having entered a plea of not guilty to the aforementioned indictment, the petitioner was found by a jury to be guilty with respect to the years 1954 and 1955 and not guilty with respect *170 to the years 1953, 1956, 1957, and 1958. Petitioner was thereafter sentenced to three years imprisonment, and this conviction was affirmed by the United States Court of Appeals for the Second Circuit. Petitioner served 27 months of this sentence in Federal penitentiaries. On September 24, 1959, petitioner and Cornelius J. Noonan, a union official, were indicted on six counts of conspiracy to "obstruct, delay and affect commerce" in violation of Section 1951, Title 18, United States Code (known as the Hobbs Act). Paragraph 5 of the indictment charges as follows: That, beginning on or about September 30, 1954, and continuing thereafter to in or about December, 1958, the exact dates being to the Grand Jurors unknown, the said defendants herein did knowingly, wilfully and feloniously conspire and agree each with the other to obstruct, delay and affect commerce, as that term is defined in Section 1951 of Title 18, U.S. Code, and the movement between the States of New Jersey and New York of "The American Weekly" in such commerce, by extortion (as defined in the above section of the U.S. Code), that is to say, by obtaining property to the total value of $20,000 in annual installments *171 of $4,000 in the form of money from officers and agents of Neo Gravure, acting on behalf of Hearst Publishing, with their consent and with the consent of officers and agents of Hearst Publishing, induced by the wrongful use of fear, in that the defendants HAROLD GROSS and CORNELIUS J. NOONAN would threaten Neo Gravure and Hearst Publishing with labor disputes, work stoppages and other labor troubles in connection with shipments of "The American Weekly" in the trade and commerce aforesaid unless and until the above officers and agents of Neo Gravure, acting on behalf of Hearst Publishing, paid the defendant HAROLD GROSS on behalf of defendant HAROLD GROSS and defendant CORNELIUS J. NOONAN the above amount of money in the manner described. Contrary to the terms and provisions of Section 1951 of Title 18, United States Code. Petitioner was tried and found "not guilty" on all counts. Petitioners' tax returns reported the following adjusted gross income and itemized deductions: 1953
1954
1955
1956
1957
1958
Adjusted Gross Income
$8,800.20
$10,635.70
$13,886.93
$14,832.51
$15,515.76
$24,561.33
Contributions
500.00
500.00
550.00
600.00
700.00
1,000.00
Interest
80.00
75.00
225.00
245.00
245.00
Taxes
160.44
168.06
220.24
445.28
550.34
375.00
Casualty Loss
75.00
Medical Expense
409.99
1,246.58
1,147.53
1,506.69
2,919.38
2,917.55
Work Clothes
65.00
75.00
125.00
150.00
150.00
Business Expenses
1,800.00
Total
$1,290.43
$ 2,064.64
$ 2,267.77
$ 2,946.97
$ 4,564.72
$ 6,092.55
*172 A statutory notice of deficiency covering each of the years 1953 through 1958, was issued to petitioners on April 11, 1963. This notice adjusted taxable income by including therein the labor-influence payments and by disallowing all of the itemized deductions and substituting the standard deduction. Finding of Ultimate Fact Petitioners filed false and fraudulent tax returns for each of the years 1953 to 1958, inclusive, with intent to evade tax, and part of the resulting deficiency or underpayment of tax each year was due to petitioners' fraud. Opinion Petitioners contend that respondent is barred from asserting any deficiency for the years 1953 through 1958 by reason of the 3-year statute of limitations, [2] the statutory notice of deficiency having been issued on April 11, 1963. Respondent relies on the exception contained in section 6501(c)(1) which provides that in the case of a false or fraudulent return with intent to evade tax, a deficiency may be assessed at any time. He maintains that petitioners' returns for each of the years in question were false or fraudulent and filed with intent to evade tax. *173 Respondent alternatively alleges that petitioners omitted from their 1956 and 1957 returns amounts of gross income which exceeded 25 percent of the gross income reported in those respective returns and that, thus, a 6-year statute of limitations applies to the assessment of deficiencies for those years by reason of section 6501(e)(1)(A). Respondent also relies on his allegation of fraud to sustain the 50 percent additions to tax under section 6653(b), and asserts that additions to tax with respect to estimated income tax liabilities must be sustained because petitioners failed to present evidence to rebut the presumptive correctness of his determination. Respondent contends also that as to the years 1954 and 1955 petitioners are collaterally estopped to deny fraud because of petitioner, Harold Gross' criminal conviction for income tax evasion, for those years. Relying on John W. Amos, 43 T.C. 50 (1964), affirmed 360 F. 2d 358 (C.A. 4, 1965), respondent argues that as to those two years petitioners are estopped to deny their liability for the additions to the tax imposed under section 6653(b) of the 1954 Code or that the returns for 1954 and 1955 were *174 false and fraudulent with intent to evade tax. In response to these arguments petitioners do not actually argue that collateral estoppel does not apply to the two criminal conviction years; they seek to go behind the jury verdict of conviction in the criminal case and argue that because Gross was convicted only for those two years in which he was charged with receipt of the $4,000 payments and the $2,500 payments, this is evidence that he did not actually receive the $4,000 payments in any year. In effect, we view petitioners' argument on brief as a concession that they are collaterally estopped from contesting fraud for 1954 and 1955, but as we hereinafter indicate we need not pass on this issue in the light of our conclusion that fraud has been shown for each year by respondent's clear and convincing evidence of record herein. The questions presented in this case are essentially factual. Respondent has increased petitioners' gross income by including therein certain labor-influence payments allegedly received by Harold Gross in cash from Neo Gravure. Petitioner denies ever having received any such payments. Because the nature of these alleged payments was such that documentation *175 would have been undesirable, a determination whether or not the payments were actually made must be based largely upon oral testimony. The only witness on behalf of the petitioners on the question of the labor-influence payments was the petitioner, Harold Gross, who testified that he did not receive such payments. Respondent's principal witnesses were Chenicek and Hillbrant, two highranking officers of Neo Gravure. Both of these witnesses for respondent testified that the alleged payments were made, and they described the circumstances and details surrounding them. Their testimony forms the basis for our Findings of Fact concerning these payments. The two officers gave highly credible testimony, the account of each being consistent with that of the other. This evidence was further corroborated by the transcript of testimony, of J. D. Gortatowsky, Chairman of the Board of Hearst Consolidated Publishing Company, now deceased, which testimony was given in the earlier trial of petitioner for criminal tax evasion. Gortatowsky testified to the effect that $4,000 payments were to be made to secure labor peace and that he authorized the payments, although he was against them. Copies of canceled *176 checks drawn to the order of cash were introduced to support the oral testimony. Petitioners' only attack on this testimony (aside from the conflicting testimony of Harold Gross) is an argument that Neo Gravure's failure to report the alleged payments in W-2 or 1099 Forms and to reflect them properly in its accounting records indicates that no such payments were made to petitioner. The payments in question were of an unusual variety and certainly not of a type normally encountered by persons charged with business record keeping. Hence, there is no generally recognized manner of accounting for such payments, and it was necessary for Hillbrant to make an ad hoc determination as to how they should be recorded. We find that the manner of accounting by Neo Gravure for the payments in question was not inconsistent with the testimony of respondent's witnesses that said payments were made to petitioner for labor influence, as determined by respondent "for services rendered." Very little weight can be placed on the fact that these payments were not reported on W-2 or 1099 Forms. Failure of Neo Gravure to report the payments to the Internal Revenue Service does not establish that they were *177 never made. The evidence of record convinces us that they were in fact made to petitioner. Petitioner relies heavily on the fact that in a prior prosecution for criminal income tax evasion, involving the same years and the same alleged labor-influence payments here involved, he was acquitted as to the years 1953, 1956, 1957 and 1958. He argues that the verdict which acquitted him as to these years and convicted him as to the years 1954 and 1955, the only two years in which the $2,500 payments for assisting in negotiating a favorable union contract were alleged to have been made, was arrived at under circumstances permitting the inference that he received only the two $2,500 payments and none of the alleged $4,000 payments. [3]
Although petitioner's prior acquittal is entitled to some evidentiary weight, it is clearly no bar to our finding civil fraud for the same years. Helvering v. Mitchell, 303 U.S. 391 (1938); Elmer J. Benes, 42 T.C. 358 (1964), *178 affd. 355 F. 2d 929 (C.A. 6, 1966); William G. Lias, 24 T.C. 280, 321 (1955), affd. 235 F. 2d 879 (C.A. 4, 1956). In Helvering v. Mitchell, supra, the Supreme Court succinctly pointed out the distinction between civil and criminal cases and the degrees of the burden of proof, stating (at page 397): The acquittal was "merely * * * an adjudication that the proof was not sufficient to overcome all reasonable doubt of the guilt of the accused." Lewis v. Frick, 233 U.S. 291 * * * It did not determine that Mitchell had not willfully attempted to evade the tax. * * * Giving due evidentiary weight to the testimony of petitioner and to the prior acquittals, we, nonetheless, are convinced that respondent has proved, through the testimony of his two witnesses plus documentary evidence, that petitioner actually received all of the payments in question, and we so find and hold. We now must take up the question whether the omission of the labor-influence payments from petitioner's gross income for each of the years in question was due to fraud with intent to evade or defeat tax, and whether, due to such omission, the returns *179 filed in these years were false and fraudulent. These are questions of fact to be determined from the whole record. Section 7454 places the burden of proving fraud on the respondent, and it must be proven by clear and convincing evidence. Luerana Pigman, 31 T.C. 356 (1958); Arlette Coat Co., 14 T.C. 751 (1950). We have found on the evidence presented at trial that petitioner understated his gross income for each of six consecutive years. These understatements established by the evidence are substantial in proportion to the income actually reported. Understated gross income ranges from a low of approximately 16 percent of the amount reported (1958) to a high of approximately 61 percent (1954). The receipt of such amounts of income over many years and the unexplained failure to report any of it are significant in determining the existence of fraud. Estate of Joseph Nitto, 13 T.C. 858, 868 (1949), appeal dismissed nolle prosse (C.A. 7, 1950), acq. on another issue, 1950-2 C.B. 3, and cases cited therein. Accord, Estate of W. Y. Brame, 25 T.C. 824 (1956), acq. as to another point, 1956-1 C.B. 3, affd. per *180 curiam, 256 F. 2d 343 (C.A. 5, 1958). The receipts were of such size and derived from such sources as to preclude any inference that they were omitted from petitioners' returns due to oversight. United Dressed Beef Co., 23 T.C. 879, 887 (1955), acq. as to another point, 1955-2 C.B. 9, appeal dismissed (C.A. 9, 1957); Estate of Joseph Nitto, supra; cf., Kalil v. Commissioner, 271 F. 2d 550 (C.A. 5, 1959), affirming a Memorandum Opinion of this Court. We are also not unmindful that petitioner, Harold Gross, was convicted of criminal tax evasion for the years 1954 and 1955. Having found as an ultimate fact that petitioners' tax returns for each of the years 1953 through 1958 were false and fraudulent and filed with intent to evade tax, we need not pass upon the merits of respondent's collateral estoppel argument as to the years 1954 and 1955. We hold that no statute of limitations bars the assessment of deficiencies and that petitioners are liable for the 50 percent additions to tax. Thus, we need not decide whether the 6-year statute of limitations of section 6501(e)(1)(A) applies to the years 1956 and 1957. We turn *181 now to a consideration of the correctness of the amounts of the deficiencies as determined by respondent. Respondent has increased petitioners' taxable income for each of the years in question by (1) including in gross income the laborinfluence payments discussed above, and (2) disallowing all itemized deductions for lack of substantiation and substituting therefor the standard deduction. Petitioners have challenged both of these adjustments. In our discussion of the fraud question we have already disposed of the issue regarding the labor-influence payments. Respondent's adjustment increasing taxable income by the amounts of these payments must be sustained. Rutkin v. United States, 343 U.S. 130 (1952), rehearing denied, 343 U.S. 952. In the notice of deficiency dated April 11, 1963, respondent informed petitioners that itemized deductions were being disallowed for the years 1953 through 1958. The only reason stated was "lack of proper substantiation." Similarly, on brief respondent argues that we must sustain these adjustments because of petitioners' failure to offer substantiating proof. We agree with respondent. Petitioner argues that the disallowed *182 itemized deductions occurred from 7 to 13 years before trial; that at no time prior to issuance of the deficiency notice were petitioners questioned as to the deductions and that "the government" had the opportunity to include the disallowed deductions as a count in the criminal income tax indictment. He argues that the respondent merely took the position that everything on the return was fraudulent and therefore arbitrarily and capriciously disallowed the itemized deductions so that the burden of proving the correctness of his determination falls on the Commissioner, citing Helvering v. Taylor, 293 U.S. 507 (1935). Petitioners misconceive respondent's disallowance of the itemized deductions and position with respect thereto, and apparently have so done right along. The deficiency notice herein merely denies the itemized deductions in question, not because of fraud, but because petitioners never produced or presented substantiation. In respondent's answer filed herein no allegation is made that the disputed deductions were fraudulently claimed and there is no merit whatever to petitioner's apparent argument that because "the government" did not base its criminal fraud *183 indictment on an allegation that the deductions were fraudulently taken, the respondent here acted improperly, arbitrarily and capriciously in denying them in his deficiency notice. Petitioner did testify at trial that he thought he first learned that the deductions were being denied in 1963; that he went away (at some unspecified time) and that when he came back he could not find his canceled checks, letters and receipts to substantiate his claimed deductions. However, petitioner did not offer any explanation as to efforts he had made to obtain duplicate copies of his canceled checks or receipts nor did he even contend that it was not possible for him to do so. Instead he relies merely on his unsubstantiated broad and general statement that he at one time may have had some documentary evidence to support his deductions but that whatever bills he had at one time he was unable to find when he came back after being away. Even, assuming arguendo, that petitioners' records were lost, they have neither given nor offered any explanation why duplicates of the alleged canceled checks or receipts could not have been procured and produced at trial. They have produced no convincing or reliable *184 evidence either to show that respondent acted capriciously or arbitrarily in denying the vaguely described and rounded-off deductions claimed or that they were unable for any reason to substantiate the deductions in the years that intervened between issuance of the deficiency notice and trial. The burden of proving error in a deficiency determined by the Commissioner rests upon the taxpayer-petitioner and petitioner's reliance on Helvering v. Taylor, supra, is misplaced. In Helvering v. Taylor, supra, the Supreme Court concluded that where the Commissioner's determination is arbitrary and capricious there is no burden on the taxpayer to produce evidence to establish the correct amount of the deficiency. There it was taken for granted that the court rightly held the evidence sufficient "to require a finding" that the Commissioner's action was unfair and erroneous, and the determination excessive. The Court held that there was no burden on the taxpayer under such circumstances to produce evidence to establish the correct amount of the tax due. In the opinion in that same case, however, Helvering v. Taylor, supra, at 510, the Court was careful *185 to point out that the cases relied on by the Commissioner involving deductions were distinguishable because of the burden upon taxpayers to establish the amount of a deduction claimed. The petitioners have failed to establish any arbitrary or capricious action by respondent in disallowing the itemized deductions for lack of substantiation and in allowing in lieu thereof the standard deduction each year. We hold that petitioner bears the burden of proving error in respondent's disallowance of itemized deductions since such disallowance was not arbitrary and capricious and that having failed utterly to produce any evidence showing error in respondent's disallowance, respondent must prevail on this issue. Petitioners also bear the burden of proof with regard to the additions to tax for failure to declare and pay annual estimated hence, we sustain the imposition of the additions. Decision will be entered for the respondent. Footnotes
1. Sec. 293(b), I.R.C. 1939, for the year 1953; sec. 6653(b), I.R.C. 1954, for the years 1954-1958. Section 6501(a), I.R.C. 1954; sec. 275(a), I.R.C. 1939. Hereinafter all statutory references, unless otherwise noted, will be to the 1954 Code. Where appropriate, the predecessor 1939 Code section applicable to the taxable year 1953 will be incorporated by reference to the 1954 Code section.
[2]Sec. 294(d)(1)(A), I.R.C. 1939, for the years 1953 and 1954; sec. 6654(a), I.R.C. 1954↩ ("underestimation penalty") for the year 1958.
1. With the exception of the year 1954 in which the request for payment was not made until approximately October.↩
3. This inference is further bolstered by the fact that petitioner was acquitted in the Hobbs Act prosecution, the indictment in which involved only the $4,000 payments, and not the two $2,500 payments.↩